UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

JOE BALTAS,                            :
    *Plaintiff*,                  :
                                  :
    v.                            :     CIVIL ACTION NO.
                                  :     3:21cv436 (MPS)
RIZVANI, et al.,                       :
    *Defendants*,                 :

## RULING AND ORDER

The plaintiff, Joe Baltas, is an inmate in the custody of the Connecticut Department of

Correction (DOC). He has filed a civil rights complaint under 42 U.S.C. § 1983 against twelve

defendants: Correctional Officers Muhamet Rizvani and Thomas Donahue, Lieutenant Megan

Tyburski, Hearing Officer E. Tugie, Director of Offender Classification and Population

Management David Maiga ("OCPM Director Maiga"), Deputy Commissioner Angel Quiros,

Captains Nathan Alexander, Darren Chevalier, and Gregorio Robles, Wardens Giuliana Mudano

and Robert Bowies, and Commissioner Rollin Cook.

The complaint is 53 pages, and 197 paragraphs, in length. *Compl.*, ECF 1, at 1-53. It

pleads thirteen "counts," and asserts violations of the First, Fourth, Fifth, Eighth, and Fourteenth

Amendments to the U.S. Constitution, Article First, Sections 1, 3, 7, 8, 9, 10, 14, 15, and 20 of

the Connecticut Constitution, and the Administrative Procedure Act. *Id.* at 3, 40-50, ¶¶ 1, 158-

197. For the reasons set forth below, the plaintiff's complaint is dismissed in part.

## I.      Standard of Review

The court must review prisoner civil complaints against governmental actors and

"dismiss ... any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim

upon which relief may be granted," or that "seeks monetary relief from a defendant who is

immune from such relief." 28 U.S.C. § 1915A. This standard of review "appl[ies] to all civil complaints brought by prisoners against governmental officials or entities regardless of whether the prisoner has paid [a] filing fee." *Shakur v. Selsky*, 391 F. 3d 106, 112 (2d Cir. 2004) (internal quotation marks and citation omitted). Here, the plaintiff is proceeding *in forma pauperis*.

Although detailed allegations are not required, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citations omitted). A claim is facially plausible if it is supported by facts "that allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A complaint that includes only "'labels and conclusions,' 'a formulaic recitation of the elements of a cause of action' or 'naked assertion[s]' devoid of 'further factual enhancement,'" does not meet the facial plausibility standard. *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 557 (2007)). Although courts still have an obligation to interpret "a *pro se* complaint liberally," the complaint must still include sufficient factual allegations to meet the standard of facial plausibility. *See Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citations omitted).

## II.    Factual Allegations

Plaintiff is currently serving a 95-year prison sentence for Connecticut criminal convictions. ECF No. 1 at 5-6, ¶ 9. In 2019, plaintiff was serving this sentence in a Massachusetts correction facility pursuant to an interstate compact. *Id.* at 9-10, ¶ 28. On September 10, 2019, plaintiff was transferred to the Hartford Correctional Center ("Hartford") to accommodate a court appearance. *Id.* at 10, ¶ 29. Upon transfer, plaintiff was escorted to a restrictive housing unit ("RHU"). *Id.* ¶ 30.

In the RHU, plaintiff was immediately confronted by Officer Rizvani. *Id.* Officer Rizvani

happened to be friends with a DOC official whom plaintiff was then-suing in a separate civil rights case. *Id.*, ¶ 31.[1] Officer Rizvani was upset over plaintiff's lawsuit and threatened plaintiff by stating: "We'll see how you file lawsuits after I f*** you up." *Id.*

Concerned for his wellbeing, Plaintiff informed Captain Alexander of Officer Rizvani's threat and requested Officer Rizvani's removal from the RHU during his stay at Hartford. *Id.*, ¶ 32. Captain Alexander agreed to temporarily move Officer Rizvani to another Hartford unit. *Id.*, ¶ 33. But Officer Rizvani was not actually moved from the RHU. *Id.*

On the evening of September 11, 2019, Officer Rizvani was assigned to the "unit control station" of the RHU. *Id.* at 11, ¶ 34. Throughout his shift, Officer Rizvani made threatening remarks to plaintiff. *Id.* When plaintiff was released from his cell to use the shower and use the day room, Officer Rizvani left the unit control station to confront plaintiff. *Id.*, ¶ 35. Officer Rizvani attempted to initiate a physical altercation by calling plaintiff a "rat" and "a lawsuit filing b****." *Id.*, ¶ 36. He also threatened to "break [plaintiff's] skull." *Id.* Plaintiff, however, "walked away from the confrontation." *Id.*, ¶ 37.

On the morning of September 12, 2019, Officer Rizvani was, again, assigned to the RHU. *Id.*, ¶ 38. When plaintiff was released from his cell to use the day room, he was, again, confronted by Officer Rizvani. *Id.*, ¶ 39. This time, Officer Rizvani handed plaintiff freshly laundered clothes and then informed plaintiff that he had "just rubbed them on [his] nuts." *Id.* Hoping to avoid a confrontation, plaintiff walked back to his cell. *Id.* at 11-12, ¶ 40. However, Officer Rizvani instructed a control officer to leave plaintiff's cell door open, and then went to serve a meal to an inmate housed in a cell directly across from the plaintiff's cell. *Id.*, at 12, ¶¶

---

[1] Plaintiff has filed several § 1983 lawsuits against DOC officials. *See e.g.*, *Baltas v. Dones*, 3:22-cv-38 (MPS), 2022 WL 1239989 (D. Conn. April, 27 2022); *Baltas v. Erfe*, 3:19-cv-1820, 2020 WL 1915017 (D. Conn. April 20, 2020) *Baltas v. Maiga*, 3:20-cv-1177 (MPS), 2020 WL 6275224 (D. Conn. Oct., 26, 2020).

41-42. While serving food, Officer Rizvani continued to harass and insult plaintiff. *Id.*, ¶ 42.

Plaintiff exited his cell and asked Officer Rizvani, "what exactly is your problem?" *Id.*, ¶ 43. Officer Rizvani responded, "You're a lawsuit filing b****." *Id.* Plaintiff responded, "That's it? It's not that serious dude." *Id.* Plaintiff then patted Officer Rizvani's arm as a "calming gesture," and walked back toward his cell. *Id.*

As plaintiff walked away, Officer Rizvani shouted "Yeah it is and I'm gonna end up f****** you up!" *Id.*, ¶ 44. At the same time, Officer Rizvani pushed aside a meal cart to prepare for an attack. *Id.* Plaintiff attempted to deescalate the situation by telling Officer Rizvani to "calm down," while calmly patting his arm. *Id.* But Officer Rizvani was not calmed; he grabbed plaintiff by his shirt collar and twice slammed him against a cell door. *Id.* at 12-13, ¶¶ 46, 47. Officer Rizvani also choked plaintiff by balling his hands into fists whilst holding plaintiff's shirt collar. *Id.* at 13, ¶ 48.

Dazed and frightened, plaintiff "lashed out in self defense." *Id.*, ¶¶ 49-50. A struggle ensued, wherein Officer Rizvani repeatedly struck plaintiff in the face, head, and body with his closed fist. *Id.* ¶ 51. Just as plaintiff broke free from Officer Rizvani's grasp, other correctional officers arrived on the scene. *Id.* at 14, ¶ 54. Plaintiff put up his hands as he exited the cell, but Officer Donahue sprayed plaintiff in the face with mace. *Id.*, ¶ 54.

In response to being sprayed with mace, plaintiff kneeled and placed his hands behind his head, posing no threat. *Id.*, ¶ 55. However, Officer Donahue continued to spray mace at Plaintiff, while stating: "You assaulted staff you piece of s***." *Id.* At this point, Lieutenant Tyburski arrived on the scene and instructed Officer Donahue to "spray him again so he knows he f***** up." *Id.*, ¶ 56. Simultaneously, Lieutenant Tyburski discharged her own mace at the then-kneeling plaintiff. *Id.*, ¶ 57.

4

Although plaintiff's body was now painfully covered in mace, he remained non-combative. *Id.*, ¶ 58. Nonetheless, Lieutenant Tyburski ordered Officer Donahue to "slam his f****** head down." *Id.* at 15, ¶ 59. Officer Donahue, along with other officers, then tackled plaintiff, slamming his head against a meal cart in the process. *Id.* Officers then began hitting plaintiff as they placed him in restraints. *Id.*

Once restrained, Lieutenant Tyburski ordered staff to decontaminate plaintiff by placing his head under a running shower nozzle for "mere seconds." *Id.*, ¶ 60. According to plaintiff, this minimal rinsing was intentionally ineffectual. *Id.* Plaintiff asserts that his decontamination should have entailed 15 minutes of eye flushing, 15 minutes of body rinsing, and a change of clothes. *Id.*, ¶ 61.

Lieutenant Tyburski next ordered plaintiff to be placed in in-cell restraints. *Id.*, ¶ 62. Officer Donahue, along with other officers, placed plaintiff in wrist and ankle restraints tethered by a belly chain. *Id.* at 16, ¶ 63. Plaintiff asserts that these restraints were intentionally misapplied to cause him further pain and discomfort. *Id.* Plaintiff repeatedly informed Lieutenant Tyburski that his restraints had been misapplied and that he was still covered in mace, but she took no remedial action. *Id.*, ¶¶ 64, 65. Plaintiff also repeatedly informed Lieutenant Tyburski that he was having difficulty breathing and experiencing chest pains. *Id.*, ¶ 66. Again though, Lieutenant Tyburski ignored plaintiff's pleas. *Id.* Plaintiff reports that, at one point, he lost consciousness. *Id.*

Following one to two hours of agonizing pain, plaintiff covered his cell window to obtain a staff response. *Id.* at 17, ¶ 69. When Captain Alexander responded, the mace on plaintiff's body was still so prevalent that it caused Captain Alexander to cough. *Id.*, ¶ 70. Plaintiff informed Captain Alexander that he required additional decontamination and that his restraints

had been misapplied. *Id.* But Captain Alexander responded: "c'mon man you assaulted staff, this is what we do when that happens." *Id.*, ¶ 71. Plaintiff informed Captain Alexander that he had only been acting in self-defense. *Id.* Captain Alexander laughed and stated: "Well now you know not to fight back. Now we get to A/S [apparently referring to placement in administrative segregation] you and send you to court." *Id.* at 18, ¶ 72. Plaintiff then emphasized that he was in pain and having difficulty breathing. *Id.*, ¶ 73. But Captain Alexander just laughed in response. *Id.*

Eventually, in response to plaintiff's many requests to decontaminate, Captain Alexander stated: "The only way you're getting a shower is if you smear s*** all over the cell." *Id.*, ¶ 74. In response, Plaintiff smeared fecal matter in his cell. *Id.*, ¶ 75. And, in response to this conduct, Lieutenant Tyburski did, in fact, permit plaintiff to take a shower. *Id.*, ¶ 76. Plaintiff reports that three and a half hours passed from the time he was sprayed with mace to the time he was permitted to shower. *Id.*, ¶ 75.

When plaintiff finished showering, Lieutenant Tyburski informed him that a state trooper had arrived to conduct a criminal investigation. *Id.* at 19, ¶ 77. Lieutenant Tyburski instructed plaintiff to "keep [his] mouth shut about Rizvani" during his interview with law enforcement. *Id.* Plaintiff asserts that Lieutenant Tyburski had, by this time, viewed the video of plaintiff's encounter with Officer Rizvani and determined that Officer Rizvani was the aggressor in their physical altercation. *Id.*

When a state trooper met with plaintiff, it was in the presence of many correctional officers. *Id.*, ¶ 78. Plaintiff informed the trooper that he wished to provide a statement outside the presence of correctional officers. *Id.* But this request was denied. *Id.* Plaintiff, ultimately, declined to tell law enforcement what had really happened, and was, thus, charged with criminal

assault. *Id.* Eventually though, the criminal charges filed against plaintiff in relation to his altercation with Officer Rizvani were dismissed. *Id.* at 39, ¶ 156.

Following his interview with law enforcement, plaintiff was, again, placed in in-cell restraints. *Id.* at 19, ¶ 79. Plaintiff asserts that this restraint was "upgraded" through application of a "black box," *Id.* Following several additional hours of in-cell restraint, plaintiff was transferred to Northern Correctional Institution ("Northern"). *Id.* ¶ 80.

Plaintiff was placed on Administrative Segregation (AS) confinement status pending resolution of AS placement and disciplinary proceedings. *Id.* at 19, 21, ¶¶ 80, 87. Plaintiff contends that, because his altercation with Officer Rizvani was classified as a "level 2" disciplinary infraction, he should have been placed on "chronic discipline" status rather than AS status. *Id.* at 19-20, ¶¶ 81-82.

On September 13, 2019, Plaintiff met with Warden Mudano, and Captains Chevalier and Robles. *Id.* at 20, ¶ 85. These officials informed plaintiff that he would be staying at Northern, on AS status, regardless of the outcome of his hearing. *Id.*.[2] When plaintiff asked why he was considered such a threat as to warrant placement in Northern, Warden Mudano replied "Quiros and Maiga want their AS time out of you." *Id.*, ¶ 86. Plaintiff asserts that the conditions of confinement at Northern were extremely harsh and restrictive, and "imposed solely as a punitive measure used to punish, demean and break prisoners' minds and wills." *Id.* at 21-25, ¶¶ 89-90.

During his AS placement, Warden Mudano, and Captains Chevalier and Robles confiscated plaintiff's non-essential personal property (television, video games, typewriter, *etc.*) *Id.* at 28-29, ¶ 104. Plaintiff contends that officials had no authority to confiscate such property. *Id.* at 29, ¶¶ 106-07.

---

[2] It is not clear whether plaintiff is referring to a disciplinary hearing or an AS placement hearing.

To no avail, plaintiff orally requested Captains Chevalier and Robles and Warden Mudano to ease the conditions of AS confinement. *Id.* at 27, ¶¶ 99-100. Plaintiff subsequently wrote to Commissioner Cook to complain about the harsh conditions of AS and his unjust AS placement. *Id.* at 27-28, ¶ 101. Warden Mudano, Captains Chevalier and Robles, Deputy Commissioner Quiros, and OCPM Director Maiga were copied on this correspondence. *Id.*

On September 13, 2019, plaintiff was served with two disciplinary reports – one for "assault on [a] DOC employee," and another for "interfering with safety or security." *Id.* at 26, ¶ 96. In response, plaintiff requested video of his altercation with Officer Rizvani and multiple witness statements. *Id.*, ¶ 97.

On September 24, 2019, plaintiff received an AS hearing notice prepared by Hearing Officer Tugie. *Id.* at 29-30, ¶ 108. Plaintiff asserts that this notice included many false allegations of fact. *Id.* Plaintiff requested an assigned advisor to obtain video recordings and inmate witness statements that could be used to corroborate his account of his altercation with Officer Rizvani. *Id.* at 30, ¶ 109. However, the advisor failed to obtain such evidence. *Id.*, ¶ 110.

On September 28, 2019, plaintiff attended an AS placement hearing that he now characterizes as a "sham" proceeding. *Id.* at 30, ¶ 112. Plaintiff views his AS hearing as a "sham," in part, because: (1) he was already subject to AS conditions of confinement; and (2) his allegedly assaultive behavior had not yet been established in a parallel disciplinary proceeding. *Id.* at 30-31, ¶¶ 112-13. After listening to plaintiff's arguments, Hearing Officer Tugie concluded the hearing by stating: "None of that matters, you're going to be AS, if you don't like it sue." *Id.* at 31, ¶ 114.

On October 2, 2019, plaintiff was involved in a verbal altercation with a Northern staff member. *Id.*, ¶ 116. As discipline, Captain Chevalier relocated plaintiff to a cell with "extremely

harsh" conditions that had been modified to "emotionally and psychologically torment and break prisoners." *Id.* Such modifications included dreary lighting, a mirror that provided no reflection, and a toilet and sink that permitted water use only twice per hour. *Id.* When plaintiff asked Warden Mundano and Lieutenant Chevalier to be moved to one of the other open cells in his unit, they refused. *Id.* at 32, ¶ 119. Lieutenant Chevalier explained that plaintiff had been moved to his current cell as "payback for getting it f***** up." *Id.*

On October 7, 2019, Hearing Officer Tugie officially recommended for plaintiff to be placed on AS due to a "direct/intentional assault on a DOC employee." *Id.*, ¶ 120. Plaintiff objects to this recommended disposition, in part, because Hearing Officer Tugie: (1) did not consider the exculpatory evidence that his advisor had failed to obtain for his defense; and (2) "used false information" to support her recommendation. *Id.* OCPM Director Maiga accepted Hearing Officer Tugie's recommendation and placed plaintiff on AS. *Id.* at 32-33, ¶ 121. In his AS placement order, OCPM Director Maiga indicated that Plaintiff was on chronic discipline ("CD") status when he allegedly assaulted Officer Rizvani. *Id.* at 33, ¶ 122. Plaintiff, however, contends that he was not on CD status at the time of his allegedly assaultive behavior, and that OCPM Director Maiga should have been aware of this fact. *Id.* at 33-34, ¶¶ 123-24. Plaintiff's appeal from his AS placement was denied by Deputy Commissioner Quiros. *Id.* at 35, ¶ 130.

On October 9, 2019, plaintiff attended a disciplinary hearing related to his alleged assault of Officer Rizvani. *Id.*, ¶ 131. Prior to this hearing, a DOC investigator reviewed a video of the physical altercation between plaintiff and Officer Rizvani and wrote a report concluding that Officer Rizvani had initiated combat with plaintiff. *Id.* The disciplinary hearing adjudicator reviewed this report—but not the video informing the report's finding—and concluded, "basically [plaintiff] and [Rizvani] got in a fight." *Id.* On the basis of this factual conclusion, the

hearing adjudicator then found plaintiff guilty of a disciplinary infraction. *Id.*

On October 11, 2019, plaintiff wrote to Commissioner Cook to complain about his AS placement. *Id.*, ¶ 132. On October 21, 2019, plaintiff's attorney wrote to Commissioner Cook (with Deputy Commissioner Quiros and Warden Mudano copied) regarding the harsh conditions of AS confinement, plaintiff's inability to adequately defend himself in administrative proceedings, and plaintiff's deteriorating mental health. *Id.*, ¶ 133.

Around October 24, 2019, plaintiff noticed deterioration in his mental health. *Id.* at 35-36 at ¶ 134. When plaintiff expressed these concerns to Captain Chevalier, Captain Chevalier responded: "Go ahead and kill yourself, it will be one less piece of s*** I have to deal with," and that mental health staff would be called only after plaintiff "was hanging." *Id.* at 36, ¶ 135. Plaintiff also informed Warden Mudano about his mental health problems and asked to be seen by a psychiatrist. *Id.*, ¶ 136. However, Warden Mudano informed plaintiff that she was retiring soon, and that he was no longer her problem. *Id.*, ¶¶ 136-37.

When Warden Bowies succeeded Warden Mudano as Nothern's warden, plaintiff asked him to make changes to the conditions of AS confinement. *Id.* at 36-37, ¶¶ 138-40. But Warden Bowies responded that he would not do this without a court order compelling him to do so. *Id.* at 37, ¶ 140. When informed about plaintiff's mental health problems, Warden Bowies took no action. *Id.*, ¶ 141.

While he remained on AS, DOC officials did not provide him with hygiene products or new clothing. *Id.*, ¶ 143. Plaintiff was told he would be provided "nothing" unless he remained indigent (defined as having less than $5.00) for period of six months. *Id.*

According to official DOC policy, plaintiff's AS placement was required to last for at least 300 days. *Id.* at 37-38, ¶ 144. But, on December 20, 2019, OCPM Director Maiga and

Commissioner Cook transferred plaintiff to a Virginia prison, pursuant to an interstate compact. *Id.*, ¶ 149. Plaintiff views this transfer as retaliatory attempt to impede litigation of his lawsuits against DOC officials. *Id.*[3]  In total, plaintiff stayed at Northern under AS conditions for just over three months. *Id.* at 19, 38, ¶¶ 80, 149.

## III.   Discussion

Plaintiff sues the defendants for violations of the First, Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution, Article First, Sections 1, 3, 7, 8, 9, 10, 14, 15, and 20 of the Connecticut Constitution, and the Administrative Procedure Act. The defendants are sued in their individual capacity to the extent that plaintiff seeks monetary damages, and their official capacity to the extent that plaintiff seek injunctive and declarative relief.[4]

### 1.   Declaratory Relief

As a remedy for several of his claims, plaintiff seeks a declaration that the defendants violated his constitutional rights. ECF No. 1 at 45-47, ¶¶ 178, 181, 185. But this relief, if granted, would be either unnecessary or unconstitutional.

To the extent plaintiff sues the defendants in their individual capacities, a judge or jury verdict in his favor would necessarily reflect a finding that the defendants violated his constitutional rights. Thus, a separate award of declaratory relief would be unnecessary. *See Richard v. Martin*, 3:20-cv-1354 (CSH), 2022 WL 5246814 at *5 (Oct. 6, 2022).

To the extent plaintiff sues the defendants in their official capacities, the Eleventh Amendment "does not permit judgments against state officers declaring that they violated federal

---

[3] Plaintiff is currently litigating this retaliatory transfer claim in a separate lawsuit. *See Baltas v. Maiga*, 3:20-cv-1177 (MPS), 2020 WL 6275224 at *8-9 (D. Conn. Oct. 26, 2020).
[4] The Court so construes the complaint because damages claims against the defendants in their official capacities are barred by the Eleventh Amendment.

law in the past." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 146 (1993).
Here, plaintiff alleges violations of his constitutional rights that occurred nearly three years ago
and that necessarily ended following his transfer to a Virginia prison. Accordingly, plaintiff's
requests for declaratory judgment are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

       **2.**      **Injunctive Relief**

       Plaintiff requests many injunctive orders to remedy alleged violations of his
constitutional rights. For the most part, these orders would compel DOC to enact new
administrative directives. ECF No. 1 at 40-48, ¶¶ 160, 162, 164, 171, 177, 181, 184, 189.

       Requests for injunctive relief made to a federal court must be supported by plausible
factual allegations of ongoing violations of federal law. *See In re Deposit Ins. Agency*, 482 F.3d
612, 617 (2d Cir. 2007). But, as has just been noted, the constitutional violations alleged in this
case ceased when plaintiff was transferred to a Virginia prison. *See Baltas v. Erfe*, 3:19-cv-1820,
2020 WL 1915017 at *12 (D. Conn. April 20, 2020) (Plaintiff's transfer to an out-of-state prison
mooted requested injunctive relief).

       Since the filing of his complaint, plaintiff has been transferred back to a DOC facility in
Connecticut. *See* Notice of Address Change, ECF No. 44. But plaintiff will never be transferred
back to Northern, as that facility closed in 2021.[5] So the conditions of AS confinement that
plaintiff alleged he suffered at Northern in 2019 cannot serve as a basis for injunctive relief. *See*
*Baltas v. Chapdelaine*, 3:17-cv-242 (RNC), 2022 WL 4599155 at *8 (D. Conn. Sept. 30, 2022)
("When an inmate is moved from the facility that is the site of his claim for injunctive relief, the
request is generally moot.") Accordingly, plaintiff's requests for injunctive relief are dismissed.
*See* 28 U.S.C. § 1915A(b)(1).

---

     [5] *See* https://portal.ct.gov/Office-of-the-Governor/News/Press-Releases/2021/06-2021/Governor-Lamont-Announces-Closure-of-Northern-Correctional-Institution (last visited Oct. 24, 2022).

### 3.      Official Capacity Claims

Plaintiff has sued the defendants in their official capacity only to the extent that he sought declarative and injunctive relief. Because the Court has dismissed plaintiff's requests for declarative and injunctive relief, his official capacity claims no longer serve a purpose. Accordingly, plaintiff's official capacity claims are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### 4.      Referral for Criminal Prosecution

In his prayer for relief, plaintiff asks the Court for "a referral to the Connecticut State's Attorney to review [the complaint's] allegations for criminal wrongdoing and prosecution." ECF No. 1 at 51. However, the Second Circuit has rejected the notion that a *federal* court may compel *state* prosecutors to initiate criminal prosecutions for violations of *state* law. *See Inmates of Attica Correctional Facility v. Rockefeller*, 477 F.2d 375, 383 (2d Cir. 1973). And plaintiff is free to inform state prosecutors of his allegations whenever he wishes. The Court therefore declines to make a "referral" and dismisses plaintiff's request for a prosecutorial referral. *See* 28 U.S.C. § 1915A(b)(1).

### 5.      Indemnification for Punitive Damages

In his prayer for relief, Plaintiff seeks an order that would prevent the state of Connecticut from indemnifying the defendants for any punitive damages awarded in this case. ECF No. 1 at 51. It is unclear what authority the Court might have to award such relief, but in any event, this request will not be ripe for consideration until: (1) a judge or jury awards punitive damages; and (2) the state of Connecticut expresses an intent to indemnify the defendants for those damages. Thus, for the time being, the Court declines to rule on plaintiff's request to prohibit indemnification.

6.      **Retaliation Claim Against Rizvani**

Plaintiff contends that Officer Rizvani violated his First Amendment rights by threatening him with violence, and actually attacking him, as retaliation for his act of filing a lawsuit against one of Officer Rizvani's colleagues. ECF No. 1 at 9-14, 40, ¶¶ 28-54, 158. The Second Circuit has "instructed district courts to approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly,* 794 F.3d 290, 295 (2d Cir. 2015). To adequately plead a retaliation claim, an inmate must plausibly allege: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Dolan*, 794 F.3d at 294 (internal quotation marks and citation omitted).

Here, plaintiff has alleged facts supporting each element of a retaliation claim. As to the first element, the filing of a lawsuit is a constitutionally protected activity. *See Stewart v. Ayala*, 3:20-cv-1938 (CSH), 2022 WL 4356467 at *8 (D. Conn. Sept. 20, 2022) ("Protected speech or activity includes, for example, filing a lawsuit, an administrative complaint, or a prison grievance.") As to the second element, threats of violence *may* constitute adverse action if they are sufficiently direct and specific. *See Mateo v. Fischer*, 682 F. Supp. 2d 423, 434 (S.D.N.Y. 2010) ("[N]ot all [verbal threats constitute adverse action]. The less direct and specific a threat, the less likely it will deter an inmate from exercising his First Amendment rights.") The threats attributed to Officer Rizvani are direct and specific. Thus, they could, perhaps, support a finding of adverse action. But because Rizvani's threats allegedly culminated in an act of unprovoked violence, the Court has little difficulty in finding that plaintiff has adequately pled adverse

14

action. *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) (Second Circuit has "no trouble finding" that a "severe beating" could constitute adverse action).

The final element of causation may be inferred by the proximity in time between protected speech and adverse action. *See e.g.*, *Baltas*, 2020 WL 1915017 at \*15. Here, plaintiff alleges that Officer Rizvani threatened and attacked him several months following his filing of a lawsuit. ECF No. 1 at 9-10, ¶ 28. This temporal proximity would be sufficient to warrant retention of his claim, for the time being. *See Espinal*, 558 F.3d at 129 (The passage of six months between the dismissal of a lawsuit and an allegedly retaliatory beating supported an inference of causal connection). But plaintiff also alleges that Rizvani explicitly attributed his threats and violence to plaintiff's lawsuit filings. ECF No. 1 at 10-12, ¶¶ 31, 36, 43. Accepting this allegation as true—as the Court must during initial screening—the causal link between plaintiff's speech and Officer Rizvani's adverse action is clear. Accordingly, the Court will permit plaintiff's retaliation claim against Officer Rizvani to proceed for further development of the record.

### 7.     Excessive Force Claim Against Rizvani

Plaintiff contends that Officer Rizvani's alleged retaliatory conduct also violated his Eighth Amendment rights. ECF No. 1 at 40, ¶ 158. To the extent that plaintiff objects to the retaliatory motive of Officer Rizvani's conduct, he alleges a First, rather than Eighth, Amendment claim. *See Gill v. Pidlypchak*, 389 F.3d 379, 384 (2d Cir. 2004). And, to the extent that plaintiff challenges Officer Rizvani's verbal harassment, he states no viable §1983 claim. *See Merrill v. Schell*, 279 F. Supp. 3d 438, 443 (W.D.N.Y. 2017) ("Mere threats or verbal harassment, without any appreciable injury, generally are not actionable under section 1983.") (quotation marks and citation omitted). But to the extent plaintiff seeks to hold Officer Rizvani

liable for an allegedly violent attack, plaintiff has pled a viable Eighth Amendment excessive force claim.

When an inmate alleges use of excessive force by a correctional officer, the issue is "whether force was applied in a good-faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). The "core judicial inquiry" is not whether a certain quantum of injury was sustained, but rather whether unreasonable force was applied given the circumstances. *Wilkins v. Gaddy,* 559 U.S. 34, 37 (2010).

Here, plaintiff claims that Officer Rizvani twice slammed his head and body against a steel door, choked him, and repeatedly struck him with closed fists. ECF No. 1 at 12-14, ¶¶ 46-53. Officer Rizvani's initial use of force could, perhaps, be attributed to a misinterpretation of plaintiff's "calming" arm patting. *Id.* at 12, ¶¶ 43, 45. But Officer Rizani allegedly responded to plaintiff's patting with a protracted, violent assault during which plaintiff refused to fight back. *Id.* at 13-14, ¶ 52. When plaintiff's allegations are accepted as true, Officer Rizvani was applying force for the very purpose of causing harm. Accordingly, the Court will permit plaintiff to proceed with an Eighth Amendment excessive force claim against Officer Rizvani.

### 8.      Excessive Force Claims Against Donahue and Tyburski

Plaintiff brings additional Eighth and Fourteenth Amendment excessive force claims against Officer Donahue, and Lieutenant Tyburski.[6] These claims pertain to Donahue and Tyburski's use of mace and in-cell restraints. *Id.* at 41, ¶ 161.

---

[6] Plaintiff states an Eighth and Fourteenth Amendment excessive force cause action against Officer Donahue, Lieutenant Tyburski, *and* Officer Rizvani. ECF No. 1 at 41, ¶ 161. But, just prior to noting these causes of action, plaintiff purported to bring an Eight Amendment claim against just Officer Rizvani. *Id.* at 40, ¶¶ 158-59. Having just determined that plaintiff has adequately pled an Eighth Amendment excessive force claim against Officer Rizvani, the Court need not revisit this issue.

16

When a sentenced prisoner brings discrete Eighth and Fourteenth Amendment excessive force claims, the Fourteenth Amendment claim "will be subsumed by the Eighth Amendment claim as the Eighth Amendment offers greater protection to prisoners." *See Felix-Torres v. Graham*, 521 F. Supp. 2d 157, 164 (N.D.N.Y. 2007). Accordingly, plaintiff's Fourteenth Amendment excessive force claims are dismissed. *See* U.S.C. §1915A(b)(1).

Prison officials may violate the Eighth Amendment by spraying an obviously compliant prisoner with a chemical agent. *See Al-Bukhari v. Semple*, 3:16-cv-1428 (SRU), 2017 WL 2125746 at *4 (D. Conn. May 16, 2017). And while the application of in-cell restraint does not inherently violate the Constitution, restraint causing significant pain, discomfort, or injury may constitute excessive force. *See Shehan v. Erfe*, 3:15-cv-1315 (MPS), 2017 WL 53691 at *10 (D. Conn. Jan. 4, 2017).

Here, Officer Donahue and Lieutenant Tyburski each sprayed plaintiff with mace. ECF No. 1 at 14, ¶¶ 54, 57. While Officer Donahue may have initially perceived himself to be protecting a fellow officer from an inmate assault, the protracted spraying alleged in the complaint permits an inference that Officer Donahue and Lieutenant Tyburski each understood plaintiff to pose no threat during at least some of the time that they sprayed him. *Id.*, ¶¶ 54-58.

Plaintiff further asserts that Officer Tyburski instructed staff to ineffectually rinse mace from his head for "mere seconds" prior to ordering his placement in in-cell restraints. *Id.* at 15, ¶¶ 60, 62. And, according to plaintiff, Officer Donahue and Lieutenant Tyburski intentionally applied restraints too tightly for the purpose of causing him pain and discomfort. *Id.* at 16, ¶ 63. Officer Donahue and Lieutenant Tyburski ultimately permitted plaintiff to remain tightly restrained, and covered in mace, for approximately three and a half hours. *Id.* at 18, ¶ 75.

Officer Donahue and Lieutenant Tyburski's alleged conduct permits an inference that

17

they applied force for the very purpose of harming plaintiff. Accordingly, the Court will permit plaintiff to proceed with Eighth Amendment excessive force claims against Officer Donahue and Lieutenant Tyburski.

### 9. Deliberate Indifference Claims Against Alexander and Tyburski

Plaintiff brings Eighth Amendment deliberate indifference claims against Captain Alexander and Lieutenant Tyburski. These claims pertain to Alexander's and Tyburski's refusal to allow plaintiff to wash his mace-covered body while restrained within a cell. *Id.* at 42, ¶ 163.

"A prison official's deliberate indifference to a prisoner's medical needs violates the Eighth Amendment's protection against cruel and unusual punishment." *Albukhari*, 2017 WL 2125746 at *3. "The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d. Cir. 1994). Objectively, a plaintiff must allege a "sufficiently serious" harm or threat of harm. *Id.* Subjectively, a plaintiff must allege that a defendant-official acted with "a sufficiently culpable state of mind." *Id.* This culpable mental state exceeds mere negligence and is akin to criminally reckless intent. *See Farmer v. Brennan*, 511 U.S. 825, 839-40 (1994).

Here, while placed in in-cell restraints, plaintiff allegedly informed Lieutenant Tyburski and Captain Alexander that he was suffering extreme pain caused by mace that had not yet been washed from his body. ECF No. 1 at 16-18, ¶¶ 64, 66, 71-73. Nonetheless, Tyburski and Alexander did not permit plaintiff to shower until approximately three and a half hours had passed from the time that he was first sprayed with mace. *Id.* at 18, ¶ 75.

Plaintiff has adequately pled the objective and subjective elements of an Eighth Amendment deliberate indifference claim. *See Albukhari*, 2017 WL 2125746 at *3 (deliberate indifference claim supported, in part, by an allegation that prison officials denied plaintiff's

request to shower after he was sprayed with a chemical agent). Accordingly, the Court will

permit plaintiff's deliberate indifference claims to proceed against Captain Alexander and

Lieutenant Tyburski.

### 10.    Due Process Claims Relating to Plaintiff's Initial Placement in AS Against Tugie, Maiga, Quiros, and Cook

Plaintiff contends that the above noted defendants violated his due process rights in

multiple ways by placing him in AS. ECF No. 1 at 42-44, ¶¶165-72. Although plaintiff purports

to bring his due process claims under the First and Fourteenth Amendments, the First

Amendment does not guarantee due process of law. *See Baltas*, 2020 WL 1915017 at \*30. Thus,

as an initial matter, the Court dismisses plaintiff's First Amendment due process claims. *See* 28

U.S.C. § 1915A(b)(1).

The Fourteenth Amendment's Due Process Clause "protects persons against deprivations

of life, liberty, or property." U.S. Const. amend XIV. "Liberty interests protected by the

Fourteenth Amendment may arise from two sources – the Due Process Clause itself and the laws

of the States." *Hewitt v. Helms*, 459 U.S. 460, 466 (1983). The standard analysis for a claim of a

violation of procedural due process "proceeds in two steps: [a court] first ask[s] whether there

exists a liberty or property interest of which a person has been deprived, and if so [the court]

ask[s] whether the procedures followed by the State were constitutionally sufficient." *Swarthout*

*v. Cooke*, 562 U.S. 216, 219 (2011).

### A.    Liberty Interest

Although plaintiff asserts that his due process rights were violated in a multitude of ways,

each of his claims implicates the same purported liberty interest – remaining free of AS

confinement. ECF No. 1 at 42-43, ¶ 165. Plaintiff was, ultimately, confined under AS conditions

for 99 days and was officially placed in AS for approximately 74 days. [7]

AS placements—particularly those lasting fewer than 305 days—do not necessarily create a constitutional liberty interest. *See Sandin v. Conner*, 515 U.S. 472, 484 (1995) (Disciplinary segregation placements that do not impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life" do not create liberty interests); *see also Palmer v. Richards*, 364 F.3d 60, 64-64 (2d Cir. 2004) ("Where the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record of the conditions of the confinement relative to ordinary prison conditions is required" to establish a liberty interest.) (quotation marks and citation omitted). But even relatively short AS placements—those lasting fewer than 101 days—may create a liberty interest if the conditions of segregated confinement that an inmate must endure are "more severe" than "normal." *Palmer*, 364 F.3d at 65.

Here, plaintiff alleges that his conditions of confinement in AS were so atypical and harsh that they resulted in a violation of his Eighth Amendment rights. ECF No. 1 at 44-45, ¶¶ 173-76. Thus, for initial review purposes, the Court concludes that plaintiff has adequately pled facts establishing a liberty interest in remaining free from AS placement. *See Palmer*, 364 F.3d at 65-66 ("In the absence of a detailed factual record, we have affirmed dismissal of due process claims only in cases where the period of time spent in [segregation] was exceedingly short.")

## B.   Sufficient Procedures

---

[7] Plaintiff was housed under AS conditions immediately upon his September 12, 2019, transfer to Northern, and officially placed on AS around October 7, 2019. (ECF No. 1 at 19, 32, ¶¶ 80, 121). Plaintiff's AS placement ended on December 20, 2019, by virtue of his transfer to an out-of-state prison. *Id.* at 38, ¶ 149.

When an inmate has a liberty interest in remaining free from AS placement, prison officials must provide him with "'some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding'" the matter. *Proctor v. LeClaire*, 846 F.3d 597, 609 (2d Cir. 2017) (quoting *Hewitt v. Helms*, 459 U.S. 460, 474 (1983)). So long as these requirements are met, and proceedings are held "within a reasonable time following the inmate's transfer" to administrative segregation, "and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied." *Hewitt*, 459 U.S. at 476 n.8; *see also Jordan v. Gifford*, 3:19-cv-1628, 2022 WL 3106965 at *27 (D. Conn. Aug. 4, 2022). The Ad Seg decision may "'turn[ ] largely on purely subjective evaluations and on predictions of future behavior.'" *Proctor*, 846 F.3d at 609 (quoting *Hewitt*, 459 U.S. at 474).

Here, plaintiff was provided with formal notice of AS placement proceedings four days prior to a hearing on the matter. ECF No. 1, at 29-30, ¶¶ 108, 112. Plaintiff was appointed a hearing advisor to assist him in collecting evidence to further his defense. *Id.* at 30, ¶ 110. Plaintiff personally attended an AS placement hearing and was permitted to present argument as to why he should not be placed on AS. *Id*. at 30-31, ¶¶ 112-13. This treatment bears the hallmarks of constitutional due process. Plaintiff, however, contends that he was deprived of due process in nine respects. ECF No. 1 at 42-43, ¶¶ 165, 168.

First, plaintiff objects to the fact that he was "prematurely" confined under AS conditions prior to his official placement in AS. *Id.*, ¶ 165. However, DOC Administrative Directives explicitly permit plaintiff's placement in restrictive housing pending adjudication of AS placement and disciplinary proceedings. *See* A.D. 9.4(3)(B).[8] And Second Circuit precedent permits an inmate's administrative confinement in segregated housing pending resolution of

---

[8] Current DOC Administrative Directive are accessible at https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Directives-and-Polices-Links. (Last visited October 24, 2022).

disciplinary proceedings. *See Bolden v. Alston*, 810 F.2d 353, 357 (1987); *see also Malik v. Miller*, 679 F. Supp. 268 (W.D.N.Y. 1988). Thus, plaintiff's purportedly "premature" AS confinement did not affront due process.

Second, Plaintiff complains that the outcomes of his AS placement proceedings were "predetermined." ECF No. 1 at 42-43, ¶ 165. While preordained AS placement decisions may affront due process, *see Proctor*, 846 F.3d at 613 (questioning the constitutionality of AS review hearings that had the appearance of mere formalities), plaintiff's claim is not factually supported. Plaintiff does attribute statements to some DOC officials—ones not actually deciding whether he should be placed in AS—indicating that his AS placement was inevitable. ECF No. 1 at 20, ¶ 85. But these statements were simply predictions and there are no facts pled to suggest that the statements were based on personal knowledge or amounted to more than speculation. And it is not clear what facts plaintiff relies upon to infer that Hearing Officer Tugie, OCPM Director Maiga, and Deputy Commissioner Quiros predetermined their respective recommendations, orders, and affirmations of his AS placement. The mere fact that these defendants were not, ultimately, receptive to plaintiff's arguments does not constitute a due process violation.

Third, Plaintiff contends that "false information" was introduced during his AS placement hearing. *Id.* at 42-43, ¶ 165. However, plaintiff "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest." *Freeman v. Rideout*, 808 F.2d 949, 951 (2d Cir. 1986). Thus, even if plaintiff's "false information" claim were factually proven, it would not establish a violation of his due process rights.

Fourth, plaintiff asserts that he was denied "evidence or witnesses" at his AS placement hearing. ECF No. 1 at 42-43, ¶ 165. But, in his complaint, plaintiff indicates that DOC appointed

an advisor who was tasked to assist in the preparation of his defense. Plaintiff alleges that this advisor "failed and/or refused to collect, secure or review any [ ] requested or witness statements" on his behalf. *Id.* at 30, ¶ 110. However, plaintiff did not name his disciplinary hearing advisor as a defendant in this suit. *Id.* at 5-8, 30, ¶¶ 9-21, 109. Because the defendants named to this suit were not personally involved in any alleged failure to collect evidence, this aspect of plaintiff's due process claim is untenable. *See Wright v. Smith*, 21 F. 3d 496, 501 (2d Cir. 1994) ("personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.") (quotation marks and citation omitted).

Fifth, plaintiff appears to argue that officials improperly conducted his AS placement hearing prior to a separate disciplinary hearing held to determine whether plaintiff had assaulted Officer Rizvani. ECF No. 1 at 30, 35, 42-43, ¶¶ 112, 131, 165. However, "Fourteenth Amendment due process does not require that a disciplinary hearing occur prior to an administrative placement decision." *Jordan*, 2022 WL 3106965 at *28 (citing *Hewitt*, 459 U.S. at 476, 476 n.8; *Proctor*, 846 F.3d at 609).

Sixth, plaintiff appears to object to the fact that OCPM Director Maiga—the official who officially placed him in AS—was not present at his AS hearing. ECF No. 1 at 42-43, ¶ 165. While this assertion might support a due process claim if OCPM Director Maiga had "overruled" a recommendation that plaintiff should <u>not</u> be placed in AS, that is not what allegedly occurred. After Hearing Officer Tugie determined that AS placement was warranted, OCPM Maiga's authority to, nonetheless, decline placement afforded plaintiff with an additional measure of due process.

Seventh, Plaintiff complains about a "failure of adequate notice" prior to his AS hearing. ECF No. 1 at 42-43, ¶ 165. But this claim is contradicted by the factual allegations in the

complaint. Plaintiff alleges that he was informally notified of a pending AS hearing immediately upon his transfer to Northern. ECF No. 1 at 20, ¶ 85. And plaintiff admits that he received an official "notice of hearing" from Hearing Officer Tugie four days prior to his AS hearing. *Id.* at 29-30, ¶¶ 108, 112. Because plaintiff was not caught off guard by a surprise AS hearing, his inadequate notice claim lacks merit. *See Hewitt*, 459 U.S. at 476 ("An inmate must merely receive some notice of the charges against him.")

Eighth, plaintiff assert that the defendants had no authority to place him on AS for behavior constituting a "Level 2" disciplinary infraction. ECF No. 1 at 43, ¶ 168. However, plaintiff's AS placement was not triggered by a finding that he committed a specific type of disciplinary infraction. Rather, it was predicated upon a more general finding that he posed "a threat to the security of the facility or a risk to the safety of staff or other inmates and that [he could] no longer be safely managed in general population." *See* A.D. 9.4(3)(B). Thus, plaintiff's claim lacks merit.

Ninth, and finally, plaintiff appears to argue that the defendants violated his due process rights by placing him in AS for acting in self-defense after being attacked by Officer Rizvani. ECF No. 1 at 43, ¶ 169. But Hearing Officer Tugie, OCPM Director Maiga, and Deputy Commissioner Quiros do not appear to have factually concluded that plaintiff was acting in self-defense during his physical altercation with Officer Rizvani. And, even if Hearing Officer Tugie and OCPM Director Maiga placed plaintiff in AS based on mistaken factual findings, this would not constitute a due process violation. Since plaintiff's placement in AS appears to have been predicated upon some reliable evidence—Officer Rizvani's account of the event, if nothing else—it comports with due process. *See Elder v. McCarthy*, 967 F.3d 113, 129 (2020) ("[D]isciplinary determinations [must] be supported by some *reliable* evidence of guilt.")

(quotation marks and citation omitted).

### C.   Conclusion

Plaintiff has not pled any viable claims that the defendants denied him due process of law prior to placing him in AS. Accordingly, these due process claims are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### 11.   Conditions of Confinement Claim Against Chevalier, Robles, Mudano, Bowies, Quiros, and Cook.

Plaintiff contends that the above-noted defendants violated his First, Fourth, Fifth, Eighth, and Fourteenth Amendment rights by subjecting him to cruel and unusual conditions of confinement while placed in AS. ECF No. 1, at 44-45, ¶¶ 173-78. However, a sentenced prisoner's allegations of cruel and unusual conditions of confinement are exclusively evaluated under the Eighth Amendment. Thus, as an initial matter, the Court dismisses plaintiff's First, Fourth, Fifth, and Fourteenth Amendment claims. *See Diaz v. Hanna*, 3:20-cv-1180 (VAB), 2021 WL 1600585 at *5 (D. Conn. April 23, 2021); *see also* 28 U.S.C. § 1915A(b)(1).

The Supreme Court has held that an inmate's conditions of confinement may be "restrictive or even harsh" but may "not involve the wanton and unnecessary infliction of pain" or violate "contemporary standard[s] of decency." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981) (citation omitted). To state a claim of deliberate indifference to health or safety due to unconstitutional conditions of confinement, an inmate must satisfy objective and subjective elements. Objectively, the inmate must allege that he was incarcerated under a condition or a combination of conditions that resulted in a "sufficiently serious" deprivation of a life necessity or a "human need[ ]" or posed "a substantial risk of serious harm" to his health or safety. *Farmer*, 511 U.S. at 834; *Rhodes*, 452 U.S. at 347. The Supreme Court has identified the following basic human needs or life necessities of an inmate: food, clothing, shelter, medical

25

care, warmth, safety, sanitary living conditions, and exercise. *See Wilson*, 501 U.S. at 304;

*DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989); *Rhodes*, 452 U.S.

at 348. And the Second Circuit has additionally recognized sleep as "critical to human

existence." *Walker v. Schult*, 717 F.3d 119, 126 (2d Cir. 2013).

To satisfy the subjective element of a deliberate indifference claim, a plaintiff must allege

that a defendant-official acted with "a sufficiently culpable state of mind." *Hathaway*, 37 F.3d at

66. This culpable mental state exceeds mere negligence and is akin to criminally reckless intent.

*See Farmer*, 511 U.S. at 839-40.

Within his complaint, plaintiff includes a list of 36 "severe and harsh" conditions of his

AS confinement. ECF No. 1 at 21-25, ¶ 90. This list guides the Court's analysis of plaintiff's

claims.

### A.    Lack of Programs, Activities, and Job Opportunities; Limits on Showers, and Commissary Spending; Retention of Personal Property

Plaintiff alleges that, during his confinement in AS, he could not: participate in social or

educational programs or social or recreational activities; hold a prison job; shower more than

three times per week; or spend more than $25.00 per commissary visit. *Id.* at 21-23, 27, ¶¶ 90(c),

(i)-(k), (v), 98. Additionally, plaintiff could not keep all of his personal property within his cell.

*Id.* at 25, ¶ 90(jj).

These restrictions or limitations—which lasted for approximately four months—do not

constitute deprivations of the plaintiff's basic life necessities. *See Baltas*, 2020 WL 1915017 at

*25 (collecting cases and holding that nearly identical alleged deprivations, lasting for a period

of nine months, did not violated plaintiff's Eighth Amendment rights). Accordingly, these

limitations and restrictions will not contribute to plaintiff's Eighth Amendment conditions of

confinement claim.

### B.       Visitation and Telephone Calls

The plaintiff alleges that, due to his placement in AS, he was functionally deprived of the ability to communicate with non-prisoners through mail, telephone calls, or in-person social visitations. ECF No. 1, 23-24, ¶ 90(u), (bb), (cc). However, an inmate has no Eighth Amendment right to visitation or social telephone calls. *See Overton v. Bazzetta*, 539 U.S. 126, 136-37 (2003); *see also Baltas*, 2020 WL 1915017 at *26 (collecting cases and holding that similar alleged deprivations, lasting for a period of nine months, did not violate plaintiff's Eighth Amendment rights). Because these AS visitation restrictions did not deprive plaintiff of life's necessities, they will not contribute to plaintiff Eighth Amendment conditions of confinement claim.

### C.       Access to Libraries and Reading Materials

Plaintiff suggests that Northern had a general library and a law library but that he was not granted access to either. ECF No. 1 at 24, ¶ 90(x). However, library access is not a basic life necessity. *See Baltas*, 2020 WL 1915017 at 27. Plaintiff also contends that he was only permitted to keep five items of mail in his possession at a time, and that his books and magazines were confiscated upon admission to AS confinement. *Id.* at 24, 28-29, ¶¶ 90(w), 104. While restrictions on access to reading materials could implicate a First Amendment cause of action (to be considered later), they do not deprive an inmate of life's necessities. Accordingly, library and reading material restrictions will not contribute to plaintiff's Eighth Amendment conditions of confinement claim.

### D.       Congregate Religious Services

Plaintiff alleges that he could not attend congregate religious services while placed in AS.

*Id.* ¶ 90(1). While restricted access to group religious services could implicate a First Amendment cause of action (to be considered later), they do not deprive an inmate of life's necessities. *See Baltas*, 2020 WL 1915017 at 29 (construing an identical claim as a First Amendment cause of action). Accordingly, congregational worship restrictions will not contribute to plaintiff's Eighth Amendment conditions of confinement claim.

### E.    Mental Health Treatment

Plaintiff alleges that he was deprived of mental health treatment while placed in AS. ECF No. 1 at 25, ¶ 90(hh). The Court will address this allegation in the context of a stand-alone Eighth Amendment claim (to be considered later).

### F.    Sexual Harassment

Plaintiff alleges that he was "forced to walk to and from showers unclothed in nothing but open fly boxers unnecessarily exposing genitals and body to other inmates and male and female staff causing harassments and demeaning acts." *Id.*, ¶ 90(z). Plaintiff does not, however, allege that any defendant or inmate subjected him to physical sex abuse in connection with the taunts made in response to his shower escorts. Allegations of verbal sexual harassment or comments do not state a claim under the Eighth Amendment. *See Trowell v. Theodarakis*, 3:18-cv-446 (MPS), 2018 WL 3233140 at *3 (D. Conn. July 2, 2018) (allegation that correctional officer had called the plaintiff "derogatory names based on [plaintiff's] sexual orientation" did not state claim of sexual abuse under Eighth Amendment); *see also Baltas*, 2020 WL 1915017 (concluding that an identical allegation did not support an Eighth Amendment claim). Thus, plaintiff's escorts to the shower in boxer shorts will not contribute to his Eighth Amendment conditions of confinement claim.

### G.    Isolation, Excessive Noise, Lack of Sleep, Extreme Cell Temperatures, Unsanitary Conditions; Lack of Exercise, Outdoor Clothing, and

**Nutritional Meals; Inadequate Ventilation; Placement in Restraints When Leaving Cell and Showering**

Plaintiff alleges many conditions of confinement that could individually, or cumulatively, deprive him of basic human needs. He states that he was confined in a cell approximately the size of a parking space for twenty-three hours a day, and that his isolation from other inmates and a deprivation of visual stimuli caused him to experience anxiety, depression, deterioration of cognitive function, and suicidal ideation. ECF No. 1 at 21-22, 35-36 ¶¶ 90(a) – (f), ¶ 134. In addition, plaintiff suffered sleep deprivation and his exposure to constant screaming and banging by other inmates and staff members. *Id.*, ¶ 90(h), (ii). At times, he endured "extreme temperatures" in his cell. *Id.*, ¶ 90(g). He could not engage in meaningful exercise either in his cell or in his recreation cage. *Id.*, ¶ 90(m). His cell's ventilation system was not operational and/or the air filters were not changed on a regular basis, the toilets and the sinks were on timers that limited the number of times each could be used, and the toilets also did not flush properly which caused waste water in the toilets to flow back and forth between adjacent cells. *Id.* at 22-23, 31 ¶¶ 90(n) – (o), 116. Staff members served the meals to him in plaintiff's unsanitary cell from unsanitary food carts. *Id.*, ¶ 90(p) – (q). The meals did not meet basic nutritional or caloric needs. *Id.*, ¶ 90(r). Plaintiff was deprived of clothing and hygiene products. *Id.* at 24, 37 ¶¶ 90(dd) – (ee), 142-43. Staff members strip searched and shackled plaintiff every time he left his cell and failed to provide him with a hat, coat, or gloves during outdoor recreation when it was cold. *Id.*, ¶ 90(s) – (t), (aa), (ff) – (gg). Staff members transported plaintiff to the shower in restraints and did not remove the restraints when he showered. *Id.*, ¶ 90(aa).

The Court concludes that the plaintiff has plausibly alleged that these conditions deprived him of basic human needs such as food, clothing, sanitation, exercise, sleep, adequate shelter or warmth or exposed him to a substantial risk or harm to his health or safety. Accordingly, plaintiff

may proceed with Eighth Amendment conditions of confinement claims against defendants Chevalier, Robles, Mudano, Bowies, Quiros, and Cook to the extent the claims implicate the alleged conditions described in paragraph 90(a) – (h), (m) – (t), (aa), (dd) – (gg), and (ii) of the complaint.

### 12. Due Process Claims Relating to a Lack of Meaningful AS Placement Reviews Against Chevalier, Robles, Mudano, Bowies, Tugie, Maiga, Quiros, and Cook.

Plaintiff contends that the above-noted defendants violated his due process rights by depriving him of meaningful periodic reviews of his AS placement. ECF No. 1 at 46, ¶ 179. In *Hewitt v. Helms*, the U.S. Supreme Court held that "prison officials must engage in some sort of periodic review of the confinement of [an] ... inmate" placed on administrative segregation or detention to ascertain "whether [the inmate] remains a security risk." *Id.*, 459 U.S. at 477 n.9. Further, these reviews must be "meaningful," in the sense that they could, potentially, inform a decision to release a prisoner from AS placement. *See Proctor*, 846 F.3d at 614 ("[P]eriodic reviews of Ad Seg satisfy procedural due process only when they are meaningful. Reviews are meaningful only when they … consider all of the relevant evidence that bears on whether [the] administrative justification [for confinement in Ad Seg] remains valid…")

In support of his due process claim, plaintiff notes that DOC has created an AS system requiring inmates to graduate through three progressively less restrictive phases of AS before returning to the general inmate population. ECF No. 1 at 37-38, ¶ 144. Phase I of AS placement lasts a minimum of 120 days, while Phases II and III of AS placement must each last a minimum of 90 days. *Id.* Plaintiff argues that any reviews of his AS placement could not have been "meaningful," as they could not have resulted in his release from AS prior to his 300th day spent in segregated confinement. *Id.* at 38, ¶ 145.

Plaintiff's due process argument is hypothetical and disregards actual events. Plaintiff alleges that OCPM Maiga placed him on AS no earlier than October 7, 2019. *Id.* at 32, ¶¶ 120-21. And plaintiff concedes that, on December 20, 2019, OCPM Director Maiga transferred him to a prison in Virginia. *Id.* at 38, ¶ 149. So, in total, plaintiff complains of an AS placement that lasted just 74 days.[9]

Plaintiff was not constitutionally entitled to a review that could potentially result in his release from AS within the first 74 days of his placement. *See Alston v. Cahill*, 07-cv-472 (RNC) 2012 WL 3288923, at *9 n.9 (D. Conn. Aug. 10, 2012) (finding no violation of due process when an inmate was reviewed for potential AS progression at least once every four months). Accordingly, plaintiff's claims alleging a lack of meaningful AS Placement reviews are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### 13. Confiscation of Personal Property Claims Against Chevalier, Robles, Mudano, Bowies, Quiros, and Cook.

Plaintiff contends that the above-noted defendants violated his Fourth, Fifth and Fourteenth Amendment rights by confiscating his personal property upon his placement in AS. ECF No. 1 at 46-47, ¶ 182. Plaintiff's confiscated property included electronic entertainment devices, a fan, a hot pot, a typewriter, electric grooming devices, clothing, books and magazines, and a pillow. *Id.* at 28-29, ¶ 104. Significantly, plaintiff *does not* allege permanent confiscation. Rather, he asserts that his property was to be returned to him following his release from AS, in accordance with DOC Administrative Directives. *Id.* 25, ¶ 90(jj); *see also* Administrative

---

[9] In a separate lawsuit, plaintiff appears to claim that he was confined in a restrictive housing unit within the Virginia prison where was transferred due to his DOC AS status. *See Baltas v. Maiga*, 3:20-cv-1177 (MPS), 2020 WL 6275224 at *18 (D. Conn. Oct. 26, 2020). In that suit, plaintiff brought § 1983 claims against DOC officials for their alleged failure to meaningfully review his AS status during his incarceration in Virginia. *Id.* at *18-19. Because plaintiff is currently litigating a separate lawsuit bringing claims related to the purported lack of meaningful AS reviews following his December 20, 2019, prison transfer, his claims challenging the purported lack of AS reviews, in this case, must be limited to the period between October 7, 2019, and December 20, 2019.

Directive 6.10(25).

The Supreme Court has held that the Fourth Amendment proscription against unreasonable seizures does not apply when property is taken from a prisoner's cell. *See Hudson v. Palmer*, 468 U.S. 517, 528 n.8 (1984). Thus, plaintiff has not pled plausible Fourth Amendment claims. *See Baltas v. Maiga*, 3:20-cv-1177 (MPS), 2020 WL 6275224 at *10 (D. Conn. Oct. 26, 2020) (items taken during plaintiff's prison transfer did not implicate a Fourth Amendment seizure).

With respect to his Fifth Amendment claims, it is not clear whether plaintiff means to bring a claim under the Fifth Amendment's Due Process or Takings Clause. To the extent plaintiff means to bring a due process claim, his pleading fails because the Fifth Amendment's Due Process Clause is inapplicable to state actors. *See Dusenbery v. United States*, 534 U.S. 161, 167 (2002); *see also Baltas v. Maiga*, 3:20-cv-1177 (MPS), 2021 WL 2206966 at *3 (D. Conn. June 1, 2021). And to the extent that plaintiff means to bring a takings claim, his pleading fails because the defendants have not "taken" property within the meaning for the Fifth Amendment. Rather, they have permissibly stored property that plaintiff was not authorized to possess while placed in AS. *See Paalan v. U.S.*, 120 Fed. App'x 817, 822-23 (Fed. Cir. 2005) (The Takings Clause does not forbid "the retention of personal property that [an inmate] [is] not allowed to retain during his incarceration.")

Plaintiff's Fourteenth Amendment claims also fail. The Fourteenth Amendment's Due Process Clause protects prisoners from the denial of a property interest without due process of law. Here, plaintiff supports his due process claims by noting that his property was not "lost" or "damaged," and that he could not, thus, bring an administrative claim against DOC officials pursuant to Connecticut law. ECF No. 1 at 39, ¶ 153. While this could be true, it drives home the

point that the defendants were merely safeguarding plaintiff's property while he was temporarily

unauthorized to possess it. And Plaintiff is not inherently entitled to possess non-essential

property within his cell. *See Anduze v. City of New York*, 2022 WL 4586967 at *11 (S.D.N.Y.

Aug. 8, 2022) ("Plaintiff has no Constitutional right to a television in his cell.") Thus, the

temporary confiscation of plaintiff's personal belongings did not trigger a necessity for due

process protections.

In sum, plaintiff has not adequately pled claims that the defendants violated his Fourth,

Fifth, or Fourteenth Amendment rights by temporarily confiscating his personal belongings

while he was placed in AS. Accordingly, those claims are dismissed. *See* 28 U.S.C. §

1915A(b)(1).

### 14. Access to Topical Reading Materials Claim Against Chevalier, Robles, Mudano, Bowies, Quiros, and Cook.

Plaintiff contends that the above-noted defendants violated his First, Fourth, Fifth, and

Fourteenth Amendment rights by restricting his access to "reading materials, daily news, cultural

updates, and political news," while placed in AS. ECF No. 1 at 47, ¶ 183. The Court does not

discern—nor does plaintiff explain—how a restriction on access to reading materials implicates

his Fourth, Fifth, or Fourteenth Amendment rights. Accordingly, those claims are dismissed. *See*

28 U.S.C. § 1915A(b)(1).

Prisoners do retain a limited First Amendment right to access topical reading materials.

*See Beard v. Banks*, 548 U.S. 521, 528 (2006) (plurality accepting premise that prisoners retain a

First Amendment right to access newspapers and magazines). However, this right may be limited

when a prison's restrictions on access to reading materials are "reasonably related to legitimate

penological interests." *See Id.* (quoting *Turner v. Safley*, 482 U.S. 78, 87 (1987)).

In *Beard v. Banks*, the U.S. Supreme Court considered a case in which prisoners within a

level of Pennsylvania's Long Term Segregation Unit (LTSU) were denied permission to possess

any newspapers or magazines. *Id.* at 526. When LTSU prisoners challenged this policy through a

§ 1983 suit, Pennsylvania's Secretary of Corrections prevailed on a motion for summary

judgment. *Id.* at 528. On appeal, the U.S. Supreme Court upheld the district court's summary

judgment ruling, after finding that the Secretary's undisputed materials in support of summary

judgment established an adequate penological justification for the challenged newspaper and

magazine restriction. *Id.* at 530-36.

Here, plaintiff alleges that prison officials confiscated his books and magazines upon his

placement in AS confinement. ECF No. 1 at 28-29, ¶ 104. He further alleges that, while placed in

AS, he was deprived of "access to information inclusive of, but not limited to, daily news,

cultural and political updates and other important and relevant information." *Id.* at 24, ¶ 90(y).

The Court will interpret the complaint as alleging that plaintiff was totally denied access to

topical reading materials (newspapers, magazines, *etc.*) while placed in AS.

The topical reading material restriction challenged by plaintiff is similar to the one

considered by the U.S. Supreme Court in *Beard.* While the inmate-plaintiffs in *Beard* ultimately

lost their case, this result was attributed to an undisputed record developed through summary

judgment filings. *See Beard*, 548 U.S. at 533. Accordingly, the Court will permit plaintiff's First

Amendment access to reading materials claim to proceed for further development of the record.

### 15.    Eighth Amendment Deliberate Indifference to Mental Health Claim Against Chevalier, Robles, Mudano, Bowies, Quiros, and Cook.

Plaintiff contends that the above-noted defendants violated his Eighth Amendment rights

by failing to provide mental health treatment while he was placed in AS. ECF No. 47-48, ¶ 186.

The Eighth Amendment prohibits deliberate indifference to an inmate's serious mental health

needs. *See Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013)

(The Eighth Amendment "forbids" not only "deliberate indifference to serious medical needs of prisoners," but also deliberate indifference to serious "mental health care" needs.) (internal quotation marks and citation omitted). Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976).

A deliberate indifference to mental health needs claim is comprised of objective and subjective elements. Objectively, a plaintiff must allege a "sufficiently serious" mental health condition. *Spavone*, 719 F.3d at 138 (citations omitted). To determine whether a condition is "serious," courts consider whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citations omitted). Subjectively, a plaintiff must allege that the defendant "knew of and disregarded the plaintiff's serious medical needs." *Id.* at 703. This culpable mental state exceeds mere negligence and is akin to criminally reckless intent. *See Farmer*, 511 U.S. at 839-40.

Here, plaintiff alleges that, by late October of 2019, AS conditions of confinement had caused significant harm to his mental health. *Id.* at 35-36, ¶ 134. This harm included: anxiety, severe mood swings, suicidal thoughts, and general deterioration of cognitive functioning. *Id.* Plaintiff asserts that he directly conveyed his mental health problems, and his need for treatment, to Captain Chevalier, Wardens Mudano, and Warden Bowies. ECF No. 1 at 36-37, ¶¶ 135-36, 141. However, these officials each allegedly disregarded plaintiff's requests for psychiatric treatment. *Id.* And Captain Chevalier allegedly went to far as to encourage plaintiff to commit

suicide. *Id.* at 36, ¶ 135.

Plaintiff's allegations satisfy the objective and subjective elements of an Eighth Amendment deliberate indifference claim. Objectively, "propensities to attempt suicide, harm oneself, and/or exhibit severe depression or anxiety attacks have been viewed as 'sufficiently serious.'" *Young v. Choinski*, 15 F. Supp. 3d 194, 199 (D. Conn. 2014). And, subjectively, Chevalier, Mudano, and Bowies allegedly had actual knowledge of plaintiff's need for mental health treatment. Thus, Plaintiff may proceed with deliberate indifference claims against defendants Chevalier, Mudano, and Bowies. *See Baltas*, 2020 WL 1915017 at *23 (permitting claim to proceed under similar alleged factual circumstances).

In his complaint, plaintiff never purports to have communicated a need for mental health treatment to Captain Robles. And, lacking any apparent knowledge of plaintiff's untreated mental health problems, Captain Robles was not personally involved in any violation of plaintiff's Eighth Amendment rights. *See Tangreti v. Bachmann*, 983 F.3d 609 (2020) ("[A] plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" (quoting *Iqbal*, 556 U.S. at 676). With respect to Deputy Commissioner Quiros and Commissioner Cook, plaintiff does allege that his attorney sent these officials a letter noting his "rapidly deteriorating mental health." ECF No. 1 at 35, ¶ 133. But even if Cook or Quiros received this letter (a fact not alleged in the complaint), it would not suffice to establish their personal involvement in a violation of plaintiff's Eighth Amendment rights. *See Matthews v. Ashraf*, 3:22-cv-821 (JAM), 2022 WL 5187402 at *4 (D. Conn. Oct. 5, 2022) ("Merely sending a letter to a supervisor, even if the letter was received, is insufficient to demonstrate personal involvement.") Thus, plaintiff has not alleged viable deliberate indifference claims against defendants Robles, Quiros, or Cook. These claims are,

accordingly, dismissed. *See* 28 U.S.C. § 1915A(b)(1).

In sum, the Court will permit plaintiff to proceed with deliberate indifference claims against defendants Chevalier, Mudano, and Bowies, but dismiss similar claims against defendants Robles, Quiros, and Cook.

### 16. First Amendment Free Exercise Claim Against Chevalier, Robles, Mudano, Bowies, Quiros, and Cook.

Plaintiff asserts that the above-noted defendants violated his First Amendment rights by denying him "free access to his religious practice and congregate religious services" while placed in AS. ECF No. 1 at 48, ¶ 188. Because plaintiff does not explain how the defendants infringed upon his "free access to his religious practice," aside from denying him an opportunity "to attend group religious services," *see* ECF No. 1 at 22, ¶ 90(l), the Court construes plaintiff's pleading as bringing a claim that the AS prohibition on congregate religious services substantially burdened his sincerely held religious beliefs.

In the context of another § 1983 suit that plaintiff is currently litigating, the Court has recently dismissed a free exercise claim substantively identical to the one plaintiff now brings in this case. *See Baltas*, 2022 WL 4260672 at *12-14. However, the Court dismissed because it found merit in two affirmative defenses – the plaintiff's failure to exhaust administrative remedies and the defendant's qualified immunity. *See Id.* at *8, 14.

In *Baltas v. Erfe*, this Court surveyed Second Circuit caselaw and concluded that it was not clear whether DOC officials could "impose a blanket ban on group worship on all inmates placed in AS." *Id* at *14. Because plaintiff's free exercise claim has debatable merit, and because the Court generally does not consider affirmative defenses at this stage, the Court will permit this claim to proceed against defendants Chevalier, Robles, Mudano, Bowies, Quiros, and Cook.

### 17. First Amendment Freedom of Association Claim Against Chevalier, Robles,

Mudano, Bowies, Quiros, and Cook.

Plaintiff contends that the above noted defendants violated his First Amendment association rights by restricting his communications with friends and family while placed on AS. ECF No. 1 at 49, ¶ 190. The Supreme Court has observed that "freedom of association is among the rights least compatible with incarceration." *Overton*, 539 U.S. at 131. And, in the Second Circuit, there is not a clearly established right even to *spousal* visitations in prison. *See Malave v. Weir*, 750 Fed. App'x 65, 67 (2d Cir. 2019) (summary order). Further, to the extent that prisoners retain a First Amendment right to associate with friends and family, it is not violated so long as a visitation restriction "bear[s] a rational relation to legitimate penological interests." *Miller v. Annucci*, 2019 WL 4688539 at *13 (S.D.N.Y. Sept. 26, 2019); *see also Baltas*, 2020 WL 6275224 at *12.

Here, plaintiff's visitation restrictions appear to have flowed from a standard condition of AS placement. *See* Administrative Directive 9.4 Attachment A.[10] The Court perceives potentially legitimate reasons for temporarily restricting the visitation privileges of inmates placed in AS, including incentivizing inmates to modify their behavior. And plaintiff has not alleged specific facts that would permit an inference that his visitation restrictions were not reasonably related to legitimate penological goals. Accordingly, plaintiff's First Amendment freedom of association claims are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

## 18.   Equal Protection Claims

Plaintiff's complaint lists a cause of action alleging that the defendants (it is not specified which) violated his Fourteenth Amendment rights by subjecting him "to different treatments and

---

[10] Inmates on Phase I of AS are typically afforded one 30-minute family visitation per a week. But plaintiff asserts that Warden Mudano, for reasons unstated, did not permit him any family visitation while he was placed in AS. ECF No. 1 at 24, ¶ 90 bb.

conditions than his similarly situated class of individuals without cause." ECF No. 1 at 49, ¶ 192. From the complaint's factual allegations, it appears that plaintiff means to claim that his AS conditions of confinement were unconstitutionally more restrictive than those of "Level 5 prisoners on Special Needs and Special Circumstances." *Id.* at 27-28, ¶¶ 99, 102-03.

Significantly, plaintiff has not alleged that the defendants treated him differently, or discriminated against him, because of his membership in a protected class or based on some suspect classification. *See Lee v. Governor of State of New York*, 87 F.3d 55, 60 (2d Cir. 1996) ("[P]risoners either in the aggregate or specified by offense are not a suspect class...."). Thus, the Court construes plaintiff's claim may be construed as a "class of one" equal protection challenge. *See Engquist v. Oregon Dept. of Agr.*, 553 U.S. 591, 601 (2008) (Absent allegations to support "class-based" discrimination, an individual may state an equal protection claim by alleging that he or she has been intentionally and "irrationally singled out as a ... class of one.")

Although the plaintiff compares himself to other inmates who had been classified as "Level 5" inmates, he has not asserted facts from which the Court could infer that such other "Level 5" inmates are essentially identical to him. *See Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) (A plausible class of one claim requires the plaintiff to demonstrate an "extremely high degree of similarity" with the person to whom he or she is comparing himself or herself.) (internal quotation marks and citation omitted); *Hu v. City of New York*, 927 F.3d 81, 92 (2d Cir. 2019) (a class-of-one plaintiff must demonstrate the existence of a person who is "prima facie identical" to him or her and who was treated differently) (internal quotation marks and citation omitted). Thus, plaintiff has not pled plausible equal protection claims. These claims are, accordingly, dismissed. *See* 28 U.S.C. § 1915A(b)(1).

**19.    Supervisory Liability Claims**

Plaintiff's complaint lists a cause of action alleging that the defendants (it is not specified which) violated his constitutional rights by "fail[ing] to supervise subordinate staff and fail[ing] to protect plaintiff." ECF No. 1 at 50, ¶ 194. Plaintiff does not explain this claim in any greater detail.

"To hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." *Tangreti*. 983 F.3d at 620. Given the generality of his pleading, plaintiff appears to bring claims premised on an untenable theory of *respondeat superior* liability. *See Baltas*, 2020 WL 6275224 at 19. Accordingly, plaintiff's supervisory liability claims are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### 20.    Administrative Procedure Act Claims

Plaintiff's complaint lists a cause of action asserting that the defendants (it is not specified which) implemented "unconstitutional customs, practices, policies, or procedures in violation of the U.S. Constitution and the Administrative Procedure Act." ECF No. 1 at 50, ¶ 196. This pleading—which essentially asserts that the defendants unconstitutionally violated the Constitution—is too conclusory to state a cause of action. *See Iqbal*, 556 U.S. at 678 ("[M]ere conclusory statements" do not satisfy pleading standards established by the Federal Rules of Procedure).

When plaintiff pleads a violation of the "Administrative Procedure Act," it is not clear whether he refers to federal or state legislation. *See* 5 U.S.C. § 551 *et seq.*; *see also* C.G.S.A. § 4-166 *et seq.* If plaintiff means to reference the U.S. Administrative Procedure Act—which governs the processes by which federal agencies develop and issue regulations—it is not clear how the state actors named in this suit could have possibly violated the Act. On the other hand, if

plaintiff means to reference Connecticut's Administrative Procedure Act, then he asserts a violation of state law that cannot support a § 1983 claim. *See Rehberg v. Paulk*, 566 U.S. 356, 361 (2012) ("Section 1983 … creates a private right of action to vindicate violations of 'rights, privileges, or immunities secured by the Constitution and laws' of the United States.")

Regardless, plaintiff asserts that the defendants violated the Administrative Procedures Act simply by virtue of violating his federal constitutional rights. And this is, essentially, just a roundabout way of alleging an unspecified violation of the U.S. Constitution. As previously noted, this claim is too vague to state a cause of action. *See Iqbal*, 556 U.S. at 678. Accordingly, plaintiff's Administrative Procedures Act claims are dismissed. *See* 28 U.S.C. § 1915A(b)(1).

### 21.    Connecticut Constitutional Claims

Without explaining the basis of his claims, plaintiff asserts that the defendants have violated Sections 1, 3, 7, 8, 9, 10, 14, 15, and 20 of the Connecticut Constitution's First Article. ECF No. 1 at 3, ¶ 1. Presumably, plaintiff intends to bring state constitutional claims that analog his federal constitutional claims.

The Court may exercise supplemental jurisdiction over a state law claim when: "(1) there is a claim arising under the constitution or federal laws; (2) the relationship between the federal claim and the state claim permits the conclusion that the entire action comprises but one constitutional case; (3) the federal claim has substance sufficient to confer subject matter jurisdiction on the court; and (4) the state and federal claims derive from a common nucleus of operative fact." *Miller v. Lovett*, 879 F.2d 1066, 1071 (2d. Cir. 1989), *abrogated on other grounds Graham v. Connor*, 490 U.S. 386 (1989). Notwithstanding the foregoing, federal courts should refrain from exercising supplemental jurisdiction over a claim that "raises a novel or complex issue of State Law…" *See* 28 U.S.C. § 1367(c)(1); *see also Seabrook v. Jacobson*, 153

F.3d 70, 72 (2d Cir. 1998) ("Where a pendent state claim turns on novel or unresolved questions of state law, especially where those questions concern the state's interest in the administration of its government, principles of federalism and comity may dictate that these questions be left for decision by the state courts.") Because plaintiff's state law claims arise from the same circumstances as his federal claims, the Court will consider whether plaintiff has alleged plausible state constitutional causes of action that do not turn upon novel applications of state law.

### A.    Article First Section 15

Article First Section 15 of the Connecticut Constitution provides: "Every citizen has a right to bear arms in defense of himself and the state." Presumably, plaintiff asserts a violation of his Section 15 rights, because he believes himself to have been punished for acting in self-defense when attacked by Officer Rizvani. However, the Connecticut Supreme Court has interpreted Section 15 as protecting a citizen's right to possess arms (*i.e.*, weapons) for self-defense purposes. *See Benjamin v. Bailey*, 234 Conn. 455, 465 (1995). Since plaintiff does not appear to contend that the defendants infringed upon his right to possess weapons (a claim that a prisoner would be hard-pressed to make), his pleading does not implicate a potential Section 15 cause of action.

### B.    Article First Sections 7 and 9

The Connecticut Supreme Court recognized a private cause of action for monetary

damages under Article I, Sections 7[11] and 9[12] of the Connecticut Constitution when the claims arose out of unreasonable searches and seizures and unlawful arrest committed by police officers. *Binett v. Sabo*, 244 Conn. 23, 47-49 (1998). In reaching its decision, the Connecticut Supreme Court "emphasize[d] that [its] decision to recognize a *Bivens*-type remedy in this case does not mean that a constitutional cause of action exists for every violation of our state constitution." *Id.* at 47.

Although the Connecticut Supreme Court created a cause of action under Article First, Section 7 and 9 for a *Bivens*-type claim, it has not applied section 7 or 9 in the context of a case filed by an inmate or a detainee involving claims relating to excessive force by correctional staff or prison conditions of confinement. Thus, it would be inappropriate for the Court to exercise supplemental jurisdiction over the novel claims asserted pursuant to Article First, Sections 7 or 9 of the Connecticut Constitution. *See Lopez v. Smiley*, 375 F. Supp. 2d 19, 23-26 (D. Conn. 2005) (declining to exercise supplemental jurisdiction over novel, complex and undeveloped claims under Article First, Sections 7 and 9); *see also Baltas v. Dones*, 3:22-cv-38 (MPS), 2022 WL 1239989 at *20 (D. Conn. April 27, 2022) (declining to exercise supplemental jurisdiction over Section 7 and 9 claims).

### C.     Article First Sections 1, 3, 4, 8, 10, 14, and 20

Courts in this Circuit have routinely declined to recognize a private right of action under

---

[11] Article First Section 7 provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[12] Article First Section 9 provides: "No person shall be arrested, detained or punished, except in cases clearly warranted by law."

Article First, Sections 1,[13] 3,[14] 4,[15] 8,[16] 10,[17] 14,[18] and 20[19] of the Connecticut Constitution. *See*

*Baltas*, 2022 WL 1239989 (collecting cases declining to recognize a private right of action under

Article First, Sections 1, 4, 8, 10, 14, and 20); *see also Lopez v. Smiley*, 375 F. Supp. 2d 19, 23-

26 (D. Conn. 2005) (declining to exercise supplemental jurisdiction over Article First, Sections

4, 8, 10, and 14 claims); *see also*, *Richard*, 2022 WL 5246814 at 15 (collecting cases declining to

recognize a private right of action under Article First Sections 1, 3, and 8). Thus, the Court finds

that it would be improper to exercise jurisdiction over plaintiff's Section 1, 3, 4, 8, 10, 14, and 20

claims.

### D.   Conclusion

The Court concludes that it is inappropriate to exercise supplemental jurisdiction over

plaintiff's state constitutional claims. Accordingly, these claims are dismissed. *See* 28 U.S.C. §

1915A(b)(1).

---

[13] Article First Section 1 provides: "All men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive public emoluments or privileges from the community."

[14] Article First Section 3 provides: "The exercise and enjoyment of religious profession and worship, without discrimination, shall forever be free to all persons in the state; provided, that the right hereby declared and established, shall not be so construed as to excuse acts of licentiousness, or to justify practices inconsistent with the peace and safety of the state."

[15] Article First Section 4 provides: "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."

[16] In relevant part, Article First Section 8 provides: "No person shall be … deprived of life, liberty or property without due process of law…"

[17] Article First Section 10 provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."

[18] Article First Section 14 provides: "The citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance."

[19] Article First Section 20 provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his civil or political rights because of religion, race, color, ancestry or national origin."

**ORDERS**

In accordance with the foregoing analysis, the Court enters the following orders:

**(1)** All claims for declaratory and injunctive relief are **DISMISSED** pursuant to 28

U.S.C. § 1915A(b)(1).

**(2)** All claims against the defendants in their official capacities are **DISMISSED**

pursuant to U.S.C. § 1915A(b)(1). The Clerk is ordered to **TERMINATE** all official capacity

defendants as parties to this action.

**(3)** Plaintiff's request for a prosecutorial referral is **DENIED**.

**(4)** The Court refrains from ruling upon plaintiff's request for an order prohibiting the

State of Connecticut from indemnifying the defendants for punitive damages.

**(5)** Plaintiff's Administrative Procedure Act claims are **DISMISSED** pursuant to U.S.C.

§ 1915A(b)(1).

**(6)** The Court declines to exercise supplemental jurisdiction over plaintiff's claims

asserting violations of the Connecticut Constitution. These claims are **DISMISSED** without

prejudice.

**(7)** The following § 1983 claims are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1):

the Fourteenth Amendment excessive force claims against Rizvani, Donahue, and Tyburski; the

First and Fourteenth Amendment due process claims challenging plaintiff's initial placement in

AS against Tugie, Maiga, Quiros, and Cook; the First Fourth, Fifth, and Fourteenth Amendment

conditions of confinement claims against Chevalier, Robles, Mudano, Bowies, Quiros, and

Cook; the Fourteenth Amendment due process claims challenging the lack of meaningful AS

placement reviews against Chevalier, Robles, Mudano, Bowis, Tugie, Maiga, Quiros, and Cook;

the Fourth, Fifth, and Fourteenth Amendment confiscation of property claims against Chevalier,

45

Robles, Mudano, Bowies, Quiros, and Cook; the Fourth, Fifth, and Fourteenth Amendment access to topical reading material claims against Chevalier, Robles, Mudano, Bowis, Tugie, Maiga, Quiros, and Cook; the Eighth Amendment deliberate indifference to mental health needs claims against Robles, Quiros, and Cook; the First Amendment freedom of association claims against Chevalier, Robles, Mudano, Bowies, Quiros, and Cook; the Fourteenth Amendment equal protection claims; and the supervisory liability claims.

(8) All of the claims that plaintiff has brought against Hearing Officer Tugie have been dismissed. The Clerk is ordered to **TERMINATE** Hearing Officer Tugie as a party to this action.

(9) The following § 1983 claims shall **PROCEED**: the First Amendment retaliation claim against Rizvani and the Eighth Amendment excessive force claim against Rizvani; the Eighth Amendment excessive force claims against Donahue and Tyburski; the Eighth Amendment deliberate indifference claims against Alexander and Tyburski; the Eighth Amendment conditions of confinement claims against Chevalier, Robles, Mudano, Bowies, Quiros, and Cook to the extent the claims implicate the alleged conditions described in paragraph 90(a) – (h), (m) – (t), (aa), (dd) – (gg), and (ii) of the complaint; the First Amendment access to topical reading materials claim against Chevalier, Robles, Mudano, Bowies, Quiros, and Cook; the Eighth Amendment deliberate indifference to mental health needs claim against Chevalier, Mudano, and Bowies; and the First Amendment free exercise against claim Chevalier, Robles, Mudano, Bowies, Quiros, and Cook.

(10) The Clerk shall verify the current work addresses for Officer Rizvani, Captain Alexander, Officer Donahue, Lieutenant Tyburski, OCPM Director Maiga, Deputy Commissioner Quiros, Captain Chevalier, Captain Robles, Warden Mudano, Commissioner

Cook and Warden Bowies with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint and this order to them at their confirmed addresses within **twenty-one (21) days** of this Order, and report on the status of the waiver request on the **thirty-fifth (35th) day** after mailing.

(11) Should the plaintiff wish to amend his complaint, he may file a motion for leave to amend within thirty (30) days from the date of this order. The Court will not allow further amendments after that date.

(12) Defendants Rizvani, Alexander, Donahue, Tyburski, Maiga, Quiros, Chevalier, Robles, Mudano, Cook and Bowies shall file a response to the complaint, either an answer or motion to dismiss, within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms are mailed to them. If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. They may also include all additional defenses permitted by the Federal Rules.

(13) Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed within six months (180 days) from the date of this order. Discovery requests need not be filed with the court.

(14) All motions for summary judgment shall be filed within seven months (210 days) from the date of this order.

(15) According to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within **twenty-one (21) days** of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(16) The Clerk shall send a courtesy copy of the complaint and this order to the Connecticut Attorney General and the Department of Correction Legal Affairs Unit.

**(17)** The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures" which will be sent to the parties by the Clerk.

**(18)** If Plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the Court. Failure to do so can result in the dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated. He should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Plaintiff has more than one pending case, he should indicate all of the case numbers in the notification of change of address. He should also notify Defendants or defense counsel of his new address.

**(19)** If incarcerated, Plaintiff shall use the Prisoner Efiling Program when filing documents with the Court. He is advised that the Program may be used only to file documents with the Court. Local rules provide that discovery requests are not filed with the Court. D. Conn. L. Civ. R 5(f). Therefore, discovery requests must be served on Defendants' counsel by regular mail.

      **SO ORDERED** at Hartford, Connecticut, this 28th day of November 2022.


                                    /s/
                             Michael P. Shea, U.S.D.J.